UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:06-CV-95-H

AMY C. JAGLOWICZ PLAINTIFF

v.

TEXAS LIFE INSURANCE COMPANY DEFENDANT

**MEMORANDUM OPINION**

Plaintiff Amy Jaglowicz, the beneficiary of a life insurance policy issued to her late husband by Defendant Texas Life Insurance Company ("Texas Life"), brought this action alleging Texas Life's breach of contract, as well as its bad faith and intentional infliction of emotional distress ("IIED") in denying Plaintiff's claim for the benefits she asserts she was due under the policy following her husband's death. In early 2006 the parties settled Plaintiff's breach of contract claim. The scope of that settlement was the subject of this Court's December 15, 2006 memorandum opinion, which permitted Plaintiff's bad faith and IIED claims to proceed.

Texas Life has moved for summary judgment as to Plaintiff's remaining claims on the grounds that the available evidence cannot sustain them. This motion raises issues about the circumstances in which an insurance company has reasonable grounds to deny a claim under existing case law and the relevant circumstances. For the reasons that follow, the Court resolves those issues and sustains the motion.

I.

The facts of this case were considered by this Court in its previous opinion, *Jaglowicz. v. Texas Life Ins. Co.*, 2006 WL 3759599 (W.D. Ky. Dec. 15, 2006), but given that Plaintiff's bad faith and IIED claims implicate somewhat different aspects of this case, some additional discussion is appropriate.

On March 3, 2004, Plaintiff's decedent Robert Jaglowicz ("Mr. Jaglowicz") applied for a so-called "Express Issue" life insurance policy offered by Texas Life. The policy was so named due to the fact that applicants' eligibility for coverage was determined simply by reference to three questions, the following one of which is at issue here:

> Has the Proposed Insured been disabled; received treatment or care in a hospital or hospice or in a custodial, intermediate skilled nursing care or long-term care facility; received chemotherapy, radiation therapy, or dialysis treatment; received treatment at a hospital or rehabilitation center for alcohol or drug abuse within the past 6 mos.? If "yes," give details.

Defendant's Motion for Summary Judgment, Exhibit B. Mr. Jaglowicz answered "no" to this question, and on June 1, 2004, Texas Life issued him a $75,000 life insurance policy, which included a provision allowing Texas Life to contest the validity of the policy within two years of the issue date.

On July 29, 2005, less than two years after the policy was issued, Mr. Jaglowicz died. Plaintiff submitted a claim on his life insurance policy, and in its subsequent investigation of that claim, Texas Life reviewed all of Mr. Jaglowicz's medical records. These records revealed that less than six months prior to applying for the "Express Issue" policy, Mr. Jaglowicz had

undergone an echocardiogram[1] and a carotid duplex doppler examination[2] ("carotid doppler") at the Spring View Hospital in Lebanon, Kentucky. These tests were ordered by a physician treating him following an incident in which Mr. Jaglowicz reported that upon standing up from a seated position, he staggered or stumbled, and that while he never lost consciousness, those present in the room with him at the time noted weakness on the left side of his face. *Id.* at Exhibit G.[3] In light of Mr. Jaglowicz's history of cardiac issues[4] the physician not only ordered the echocardiogram and carotid doppler, but also increased his medication, placed him on a restricted diet, and attached a Holter monitor[5] to him for approximately twenty-four hours. *Id.*

Having reviewed these records, Texas Life informed Plaintiff of its initial determination regarding her claim in a letter dated October 26, 2005:

> We intend to deny your claim for benefits on the policy unless you have information which would explain to our satisfaction the discrepancy between the answers on the application and the medical records that we have obtained. You may have other information about the answers given on this application which you believe would alter our decision to deny your claim on this policy. Please

[1]An echocardiogram is "a noninvasive ultrasound procedure used to evaluate the structure and function of the heart." Kathleen Deska Pagana & Timothy J. Pagana, Mosby's Diagnostic and Laboratory Test Reference 345 (6th ed. 2003).

[2]A carotid duplex doppler examination is "a noninvasive, ultrasound test used on the extracranial carotid artery to detect occlusive disease directly . . . . [by] provid[ing] a two-dimensional image of the carotid artery along with an image of blood flow." Pagana & Pagana, *supra* note 1, at 236.

[3]Mr. Jaglowicz's cardiologist characterized the incident as a "near syncope," i.e. a near-fainting. Defendant's Motion for Summary Judgment, Exhibit F.

[4]According to Mr. Jaglowicz's medical records, he had undergone two heart valve replacements and was at the time of the incident just described taking Coumadin (an anticoagulant) and Lanoxin (used to treat heart failure and/or chronic atrial fibrillation). Defendant's Motion for Summary Judgment, Exhibit G; *see also* Physician's Desk Reference 1488–1501, 3457–63 (62d ed. 2008) (descriptions of Lanoxin and Coumadin, respectively).

[5]Holter monitoring is "a continuous recording of the electrical activity of the heart [which] can be performed for periods of up to 72 hours." In it, "an electrocardiogram (ECG) is recorded continuously on magnetic tape during unrestricted activity, rest, and sleep," and it is used "primarily to identify suspected cardiac rhythm disturbances and to correlate these disturbances with symptoms such as dizziness, syncope, palpitations, or chest pain." Pagana & Pagana, *supra* note 1, at 511.

> furnish any additional information to us in written form within the next ten days so that we can complete our evaluation of your claim.

*Id.* at Exhibit I. In a letter dated November 21, 2005, Plaintiff's counsel did not dispute the accuracy of the medical records, but argued that "[w]hile Mr. Jagolwicz was referred to Springview [sic] Hospital for these tests he ***did not*** receive care or treatment while at the hospital." *Id.* at Exhibit J (emphasis in original). That is, Plaintiff's counsel asserted, "there is a distinct difference between a patient receiving treatment for a condition in a hospital and a patient's utilization of the hospital only for purposes of testing so that a treatment plan can be initiated by the patient's physicians." *Id.*

Texas Life disagreed, concluding that "the tests performed on Mr. Jaglowicz in the hospital" fell within the ordinary meaning of the term "treatment or care in a hospital." *Id.* at Exhibit K. Thus, on December 5, 2005, Texas Life issued a final denial of Plaintiff's claim and enclosed a refund for all the premiums paid under the policy. *Id.* Plaintiff filed a breach of contract action in state court on December 29, 2005, which was removed by Texas Life to federal court. As described in the Court's previous opinion, on or around January 19, 2006, the parties agreed to a settlement of the breach of contract claim, but due to a further dispute payment was delayed. Finally on February 20, 2006, Texas Life sent a check for the full policy amount, plus interest. In the interim, Plaintiff filed an Amended Complaint, adding the claims for bad faith and IIED currently before the Court, and seeking punitive damages.[6] In its December 15, 2006 order the Court allowed these claims to proceed, and on February 28, 2008, Texas Life filed the instant motion.

---

[6]Plaintiff's request for punitive damages, though styled in her Amended Complaint as a separate count, will of course ultimately be derived from the conduct alleged in her bad faith and IIED claims. In light of the Court's disposition of those claims, Plaintiff's request for punitive damages cannot survive.

II.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party's burden may be discharged by demonstrating that there is an absence of evidence to support an essential element of the nonmoving party's case for which he or she has the burden of proof. *Id.* Once the moving party demonstrates this lack of evidence, the burden passes to the nonmoving party to establish, after an adequate opportunity for discovery, the existence of a disputed factual element essential to his case with respect to which he bears the burden of proof. *Id.* If the nonmoving party will bear the burden at trial on a dispositive issue, the nonmoving party must go beyond the pleadings and by his own affidavits, "or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted, citing Fed. R. Civ. P. 56(e)). If the record taken as a whole could not lead the trier of fact to find for the nonmoving party, the motion for summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

III.

In her Amended Complaint, Plaintiff advances her bad faith claim on three theories. First, she asserts that Texas Life's conduct violated the Kentucky Unfair Claims Settlement Practices Act ("KUCSPA"), Ky. Rev. Stat. § 304.12-230. Amended Complaint at ¶ 10. Second,

she asserts that Texas Life's conduct violated its common-law duty of good faith. *Id.* at ¶ 11. Finally, she asserts that Texas Life's conduct violated the Kentucky Consumer Protection Act, Ky. Rev. Stat. § 367.170. *Id.* at ¶ 12. Under Kentucky law, all these theories are examined under a single test, "whether brought by a first-party claimant or a third-party claimant, and whether premised upon common law theory or a statutory violation." *Davidson v. Am. Freightways, Inc.*, 25 S.W.3d 94, 100 (Ky. 2000); *see also Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 527 (6th Cir. 2006). The elements of the test, which the Kentucky Supreme Court adopted in *Curry v. Fireman's Fund Ins. Co.*, 784 S.W.2d 176, 177–78 (Ky. 1989), are as follows:

> (1) the insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) it must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed.

*Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993) (quoting *Fed. Kemper Ins. Co. v. Hornback*, 711 S.W.2d 844, 846–47 (Ky. 1986) (Leibson, J., dissenting)). Whether Texas Life was obligated to pay Plaintiff's claim is largely a moot question since it has done so. The parties' dispute focuses on the second and third elements of the bad faith test, each of which the Court will examine in turn.

A.

Texas Life is "entitled to challenge a claim and litigate it if the claim is debatable on the law or the facts." *Wittmer*, 864 S.W.2d at 890 (quoting *Fed. Kemper Ins. Co.*, 711 S.W.2d at 846–47 (Leibson, J., dissenting)); *see also Farmland Mut. Ins. Co. v. Johnson*, 36 S.W.3d 368, 375 (Ky. 2000) (citing *Empire Fire & Marine Ins. Co. v. Simpsonville Wrecker Serv., Inc.*, 880

S.W.2d 886, 890 (Ky. Ct. App. 1994)) ("If a genuine dispute does exist as to the state of the law governing the coverage question, the insured's claim is fairly debatable and the tort claim for bad faith based upon the insurer's refusal to pay the claim may not be maintained"). The essence of Plaintiff's bad faith argument is that the question of whether "treatment or care in a hospital" included or would be interpreted to include Mr. Jaglowicz's echocardiogram and carotid doppler was not "fairly debatable."

Plaintiff argues that the majority of courts that have considered either the word "treatment," the word "care," or some combination of the two have found them ambiguous as to the specific procedures before them. Therefore, Plaintiff argues that even though Kentucky courts had yet to consider the issue, they would follow the other courts and find the phrase "treatment or care in a hospital" to be ambiguous as to an echocardiogram and carotid doppler. This is particularly true, Plaintiff argues, because of the Kentucky rule that ambiguous insurance contract language "must be liberally construed to resolve any doubts in favor of the insured," *Wolford v. Wolford*, 662 S.W.2d 835, 838 (Ky. 1984). She argues that there would be no circumstances under which Kentucky courts would deem a claimant-unfriendly interpretation of "treatment or care in a hospital" to be "fairly debatable." And at a minimum, Plaintiff argues, a reasonable juror could find that the coverage question was not "fairly debatable." Plaintiff's Response at 20.

Plaintiff characterizes these prior court decisions as having effectively closed the debate as to whether the term "treatment or care in a hospital" is so ambiguous that it cannot include an echocardiogram or a carotid doppler in these circumstances. This Court does not agree. Whether specific contract terms are ambiguous in any factual context is of course a legal matter

for the court to decide. *See, e.g., Morganfield Nat. Bank v. Damien Elder & Sons*, 836 S.W.2d 893, 895 (Ky. 1993) (citing *Equitable Life Assurance Soc'y of the U.S. v. Wells*, 101 F.2d 608 (6th Cir.1939)). Kentucky courts have suggested that no bad faith claim lies where the Kentucky courts have not addressed specific policy language at issue in a given case, and where "ample authorities from other jurisdictions supported the denial of [the insured's] claim." *Empire Fire & Marine*, 880 S.W.2d at 890. In *Empire Fire & Marine*, the accident giving rise to the insured's claim "raised a legal issue involving the interpretation of an insuring clause . . . . [which] was one of first impression in Kentucky;" therefore the court found it could not "say that the status of the law was clear or that the claim was not fairly debatable." *Id.* Plaintiff argues, however, that where there is "no support in legal jurisprudence from anywhere in the country supporting a construction of the term 'treatment' in [Texas Life's] favor," the coverage question, even if it is one of first impression for Kentucky courts, cannot be said to be fairly debatable. But this assertion seems to overstate the circumstances here.

Plaintiff does not cite (and the Court has not unearthed) a case deeming "treatment" or "care" ambiguous at *all* times and with regard to *all* procedures. She does cite cases from other jurisdictions that evaluated different procedures administered under different circumstances. Those cases do not establish a universal rule of interpretation that could be considered to have settled the question of whether Kentucky courts would interpret "treatment or care in a hospital" to include those circumstances found here.[7] The Court is aware of only one other court that has

[7]Notably, the Sixth Circuit has held in an unpublished decision that a claim may be "fairly debatable" even where the legal question involved is *not* an issue of first impression under Kentucky law. *Phelps v. Unum Provident Corp.*, 245 Fed. Appx. 482, 487 (6th Cir. 2007). Certainly if Kentucky courts could have considered a specific legal issue and the issue *still* could be found to be "fairly debatable," other jurisdictions' rulings in cases involving different terms, procedures, and contexts cannot have foreclosed debate on the coverage issue in this case.

considered the exact phrase "treatment or care in a hospital," and that court explicitly found the phrase ambiguous only as to specific procedures. *Matlock v. Texas Life Ins. Co.*, 404 F.Supp.2d 1307, 1312 (W.D. Okla. 2005) (finding that neither of the competing definitions of "treatment or care in a hospital" advanced by the parties "clearly addresses *the services received by [the plaintiff]*") (emphasis added). However, *Matlock* is largely irrelevant to the question of bad faith here because it was issued after Texas Life denied Plaintiff's claim. Thus, this Court finds no Kentucky law or any other law that had decisively closed the debate on the coverage issue which Texas Life confronted here.

Plaintiff's argument that the coverage issue was effectively closed requires one to ignore the context in which Mr. Jaglowicz underwent the procedures at issue here. That context significantly undercuts Plaintiff's characterization of the tests as merely routine diagnostic evaluations. Mr. Jaglowicz was a veteran of two heart valve replacements who presented to a physician complaining of a seemingly heart-related episode that was deemed serious enough to require a Holter monitor, an increase in anticoagulant medication, and dietary restrictions, as well as two procedures that were at a minimum intended to rule out more serious problems. At bottom, Plaintiff's argument suggests that because a word or phrase is ambiguous in some (or even many) circumstances, it therefore will be ambiguous in all circumstances. This is a logically indefensible conclusion.[8] In our context, a strong argument can be made that the

[8]Regardless of whether "treatment" or "care" or some combination of those terms had been found ambiguous in other contexts, there can be no question that the phrase "treatment or care in a hospital" could nevertheless still be found unambiguous in others. For example, receiving emergency room care would surely fall unambiguously *within* the scope of "treatment or care in a hospital," whereas purchasing a bottle of ibuprofen in a hospital gift shop would just as surely fall unambiguously *outside* the scope of "treatment or care in a hospital."

procedures seem a lot like "treatment and care in a hospital."[9]

These circumstances, even viewed as favorably as possible to Plaintiff, support the proposition that Texas Life did have reasonable grounds to contest this claim. The Sixth Circuit has noted that to prevail on this second prong of the *Wittmer* test, "the insurer need not show that its interpretation of the policy language was the best interpretation, only that it was a reasonable one." *Phelps*, 245 Fed. Appx. at 487 (citing *Rawe*, 462 F.3d at 527); *see also Cowan v. Paul Revere Life Ins. Co.*, 30 Fed. Appx. 384, 388 (6th Cir. 2002) ("An insurer's position must only be 'fairly debatable,' it need not be correct as a matter of law). This showing is amply made here, and accordingly the Court finds that a reasonable juror could not conclude that Texas Life had no reasonable basis for denying Plaintiff's claim.

B.

Plaintiff has even greater difficulty with the third prong of the bad faith analysis, which requires a showing that Texas Life "either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed." *Wittmer*, 864 S.W.2d at 890 (quoting *Fed. Kemper Ins. Co.*, 711 S.W.2d at 846–47 (Leibson, J., dissenting)). As courts considering this prong have noted, "[l]iability for bad faith will arise only in those instances where an insurer acts with some degree of conscious wrongdoing, reckless or in a manner which reveals an unjustified gamble at the stake of the insured," and therefore "in order to survive a motion for summary judgment . . . . a plaintiff in a bad faith action must come forward with evidence . . . which reveals some act of conscious wrongdoing or recklessness on the part of the

[9]Indeed, comparisons may be drawn to *Hornback v. Bankers Life Ins. Co.*, in which "use of medication and monitoring," as well as "various procedures intended to assess the condition of [a plaintiff's] heart" were found to *unambiguously* "fall within the plain meaning of having 'been treated for or diagnosed as having . . . any disease of the heart,'" as they were "subsequent care" for a heart attack. 176 S.W.3d 699, 703 (Ky. Ct. App. 2005).

insurer." *Matt v. Liberty Mut. Ins. Co.*, 798 F. Supp. 429, 434 (W.D. Ky. 1991).

Much of Plaintiff's argument on this element of the test is essentially identical to her argument on the preceding element: that in light of the numerous decisions from other jurisdictions finding analogous language to be ambiguous as to analogous procedures in different contexts, Texas Life either knew or was reckless in not knowing that it had no reasonable basis for denying Plaintiff's claim. In addition to suffering from the infirmities noted above, this argument as to this prong is contradicted by the evidentiary record.

Texas Life denied this claim approximately nine days before Judge Cauthron issued her ruling in *Matlock*. Following that ruling, which is reasonably distinguishable from the instant case, Texas Life paid every claim denied within the previous two years based on its interpretation of Question 13(c) of the "Express Issue" life insurance policy application, whether those claims were previously disputed or not. These actions are hardly those of a company that previously knew or was acting in reckless disregard of whether a reasonable basis for its actions existed. Rather, they are evidence that as soon as Texas Life had *any* indication that courts might find its policy language ambiguous as to *any* procedure, that is, once the existence of a reasonable basis was called into question, Texas Life paid in full the claims it had previously contested.

Plaintiff also argues that the internal deliberations among Texas Life employees regarding the "treatment or care in a hospital" language show that Texas Life knew it had no reasonable basis for denying certain claims based on that language. The Court disagrees with Plaintiff's interpretation of these internal communications. Employees' discussions about how to improve upon their company's products do not necessarily preclude the existence of a

reasonable basis for the company's interpretation of its policy language, as they are little more than speculation that a court somewhere might find the language ambiguous as to some procedure. And more importantly, speculation that in some circumstances some court might find the language ambiguous as to some procedures falls far short of evidence "which reveals some act of conscious wrongdoing or recklessness on the part of the insurer." *Matt*, 798 F. Supp. at 434. In its entirety, Plaintiff's showing on this element of her bad faith claim provides an insufficient basis from which a reasonable juror could conclude that Texas Life "either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed," which provides an additional rationale for summary judgment.

C.

A final aspect of Plaintiff's bad faith claim deserves mention. Plaintiff also argues that Texas Life failed to conduct "a reasonable investigation based on all available information" prior to denying her claim, in violation of Ky. Rev. Stat. § 304.12-230(4). As a threshold matter, the Court is somewhat skeptical that one's duty to conduct a reasonable investigation is conceptually distinct from the "reasonable basis" analysis set forth in *Wittmer*. A claim denial could hardly be deemed to have a reasonable basis where no investigation had occurred. However, the Kentucky Supreme Court has noted even where payment of a claim may be 'fairly debatable,' an insurer must nevertheless comply with its duty under KUCSPA, "to investigate, negotiate, and attempt to settle the claim in a fair and reasonable manner." *Farmland Mut. Ins. Co.*, 36 S.W.3d at 375. Therefore the Court will analyze whether any breach of this specific duty has occurred.

A misrepresentation on an insurance policy application that is "[m]aterial either to the acceptance of the risk, or to the hazard assumed by the insurer" is a permissible ground upon

which to deny recovery under the policy. Ky. Rev. Stat. § 304.14-110. First, Plaintiff questions whether Texas Life sufficiently investigated the existence of a "misrepresentation." Plaintiff asserts that because Kentucky cases have defined a "misrepresentation" as "a statement as a fact of something which is untrue, which the insured states with the knowledge that it is untrue and with the intent to deceive, or which he states positively as true without knowing it to be true," *Aetna Ins. Co. v. Solomon*, 511 S.W.2d 205, 209 (Ky. 1974) (internal citations omitted), any "reasonable investigation" must include an inquiry into whether Mr. Jaglowicz intended to deceive or mislead Texas Life. However, Kentucky law distinguishes between "fraudulent" and "material" representations. Kentucky cases hold that "a material representation in an application for an insurance policy, *though innocently made*, will avoid it." *John Hancock Mut. Life Ins. Co. v. Conway*, 240 S.W.2d 644, 646 (Ky. 1951) (emphasis added). Therefore Texas Life's duty to conduct a reasonable investigation into whether a misrepresentation had occurred[10] was amply satisfied by its collection and review of Mr. Jaglowicz's medical records and is reinforced by its request in its October 26, 2005 letter that Plaintiff provide any additional factual information.

Second, Plaintiff questions whether Texas Life sufficiently investigated the materiality of the misrepresentation. Specifically, Plaintiff disputes Texas Life's assertion that had Mr. Jaglowicz answered "yes" to the "treatment or care in a hospital" question, he would not have received insurance coverage. Plaintiff cites statements by Texas Life representatives indicating that before it denies a claim, Texas Life evaluates whether despite the disqualifying misrepresentation, the insured would have been eligible for coverage under another product

[10]Any question as to the *validity* of Texas Life's conclusion that the procedures reflected in Mr. Jaglowicz's medical records constituted "treatment or care in a hospital" is more properly reserved for the "reasonable basis" analysis above.

offered by Texas Life. She says that Texas Life made its decision without reference to any written standards and instead based it solely on the recommendations of individual members of the claims committee. Plaintiff argues that this makes any denial "arbitrary" and in violation of Ky. Rev. Stat. § 304.12-203(3), which deems "fail[ure] to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies" an unfair claims settlement practice.

Plaintiff's argument on this point confuses Texas Life's refusal to find Mr. Jaglowicz eligible for coverage under some *other* plan with its assertion that Texas Life would not have issued the "Express Issue" policy had Mr. Jaglowicz answered "yes" to the "treatment or care in a hospital" question, which Plaintiff does not appear to dispute. Irrespective of the nature of any of Texas Life's *additional* efforts to find coverage under some other product, this undisputed fact confirms that Mr. Jaglowicz's "yes" answer was material and renders Plaintiff's arguments under Ky. Rev. Stat. § 304.12-203(3) irrelevant. *See John Hancock Mut. Life Ins. Co.*, 240 S.W.2d at 646 ("a false answer is material if the insurer, acting reasonably and naturally in accordance with the usual practice of life insurance companies under similar circumstances, would not have accepted the application if the substantial truth had been stated therein").

D.

In summary, the Court finds instructive the Kentucky Supreme Court's endorsement of the following approach to bad faith claims:

> The appropriate inquiry is whether there is sufficient evidence from which reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable.

*Farmland Mut. Ins. Co.*, 36 S.W.3d at 376 (quoting *Zilisch v. State Farm Mut. Auto Ins. Co.* 995

P.2d 276, 280 (Ariz. 2000)). This language seems analogous to a totality-of-the-circumstances inquiry, though of course it must be guided by the elements outlined in *Wittmer*, and is echoed by the Sixth Circuit's observation, noted above, that "the insurer need not show that its interpretation of the policy language was the best interpretation, only that it was a reasonable one." *Phelps*, 245 Fed. Appx. at 487 (citing *Rawe*, 462 F.3d at 527).

Applying these considerations, the Court cannot find that there is sufficient evidence from which a reasonable juror could find that Texas Life acted in bad faith, as that tort is defined under Kentucky law, in denying Plaintiff's claim. Texas Life may or may not have been correct in its decision to deny Plaintiff's claim, but that question is not before the Court. Rather, the question is whether Texas Life acted in bad faith in denying the claim. Quite simply, it would be unreasonable for a jury to find from the record before the Court that Texas Life was without a reasonable basis for its denial of Plaintiff's claim, and that Texas Life knew or acted in reckless disregard of whether such a reasonable basis existed.

IV.

In order to make out an IIED claim under Kentucky law, Plaintiff must show that: (1) Texas Life's conduct was intentional or reckless; (2) Texas Life's conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality; (3) Plaintiff experienced severe emotional distress, and (4) there was a causal connection between Texas Life's conduct and Plaintiff's emotional distress. *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 788 (Ky.2004). As this Court has noted in the past, IIED claims "should only proceed where 'the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

intolerable in a civilized community.'" *Trover v. Paxton Media Group, L.L.C.*, 2007 WL 4302088, *7 (W.D. Ky. Dec. 5, 2007) (quoting *Stringer*, 151 S.W.3d at 789).

Plaintiff's showing on this claim consists of such assertions as that "[f]ew are more emotionally vulnerable than widows, widowers or children immediately following the death of their soul mate or parent, who often is also the primary source of their financial support." Plaintiff's Response at 25. This, Plaintiff argues, made Texas Life's refusal to pay her life insurance claim outrageous in that it denied "a grieving widow" who was "ten weeks pregnant at the time," was "left to bear their final child without" Mr. Jaglowicz, and had "two small children" without "life insurance proceeds which she hoped would at least provide some degree of financial stability while she sorted out her life." *Id.* at 26.

Simply put, the conduct described by Plaintiff is woefully inadequate as a basis for an IIED claim. The types of conduct Kentucky courts have found sufficient to support an IIED claim are instructive, as are the types of conduct found insufficient to do so. *See Stringer*, 151 S.W.3d at 789–91 (listing examples of both types of conduct). In light of these examples and the spectrum they establish, the conduct at issue here fails to amount to the sort of outrageous conduct contemplated by this tort.[11] Nothing remotely approaching conduct "beyond all possible bounds of decency" can be gleaned from the record. Indeed, all correspondence sent to Plaintiff by Texas Life appears to have been polite, sympathetic, and courteous, and in its letter of October 26, 2005, Texas Life practically implored Plaintiff to give it any factual basis upon

---

[11]The Court's conclusion on this point is reinforced by reference to *Zurich Ins. Co. v. Mitchell*, where, in an employment benefits case, the Kentucky Supreme Court found that "[t]he refusal to make timely payment of benefits cannot be the basis for an action for outrageous conduct causing emotional distress" where no "conspicuously contemptible conduct," no "affirmative acts of harassment" and no "conduct clearly transcending the outer limits of civilized behavior" had occurred. 712 S.W.2d 340, 343–44 (Ky. 1986). Simply "[r]efusing to pay, however arbitrary or unreasonable," was found to fall short of what is required to proceed on an IIED claim. *Id.* at 343.

which it could justify covering Mr. Jaglowicz despite what Texas Life believed was a fatal misrepresentation on his application. In short, despite the fact that a widow would undoubtedly find the news that she would not be receiving $75,000 disappointing, Texas Life's denial of Plaintiff's claim, standing alone and without any accompanying outrageous acts, is insufficient to support Plaintiff's IIED claim, and summary judgment is appropriate.

The Court will enter an order consistent with this Memorandum Opinion.

June 12, 2008

John G. Heyburn II
Chief Judge, U.S. District Court

cc: Counsel of Record